LUIGI DI RE AND CAROLINE DI RE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Di Re v. Commissioner
Docket No. 11222-91
United States Tax Court
T.C. Memo 1993-523; 1993 Tax Ct. Memo LEXIS 539; 66 T.C.M. (CCH) 1279; November 16, 1993, Filed *539 Decision will be entered under Rule 155. For petitioners: A. Jerry Busby. For respondent: Stephen J. McFarlane. WRIGHT
WRIGHT
MEMORANDUM OPINION WRIGHT, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax for taxable years 1986, 1987, 1988, and 1989 as follows: Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661
1986
$ 102,890
$ 5,145
50 percent of
$ 25,723
the interest
due on $ 102,890
1987
181,039
9,052
50 percent of
45,260
the interest
due on $ 181,039
Additions To Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6661
6662
1988
$ 64,365
$ 3,218
$ 16,004
-0- 1989
97,043
-0- -0- $ 19,409
After concessions by both parties, which will be given effect in the Rule 155 [1] computation, the primary issue for our consideration is whether petitioners failed to report income from gambling winnings for each of the taxable years 1986, 1987, 1988, and 1989. We hold that petitioners did not fail to report taxable income from gambling winnings for the years at issue, and, therefore, we need not consider the additions *540 to tax determined by respondent in the notice of deficiency as to this issue. Background
Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated by this reference. Petitioners resided in Chandler, Arizona, at the time they filed the petition in this case. During the years at issue, petitioners were married and filed joint Federal income tax returns. Petitioners were divorced in 1991. All references to petitioner in the singular refer to petitioner Luigi Di Re. During the years at issue, petitioners owned and operated Di Re Kennels, raising an average of 150 greyhound racing dogs. Petitioners treated their kennel activity as a business, filing a Schedule C for each of the years at issue. Petitioners' kennel activity is not at issue in the instant case. In 1974, *541 petitioner purchased 15 acres of property in Chandler, Arizona, and has purchased no property since that time. Petitioner's property is sectioned into two parcels. Petitioner owns a trailer home on one parcel and an uncompleted house and two dog kennel buildings on the other parcel. In addition to his breeding activities, petitioner was heavily involved in gambling at greyhound dog racing tracks. During the years at issue, petitioner gambled 7 days a week at Phoenix Greyhound Park (Phoenix), a dog racing track. Generally, petitioner started his nightly betting with $ 600 to $ 800 in cash. If petitioner lost that amount, he cashed checks at the track in order to continue gambling. Petitioner parlayed his winnings, if any, into other bets, and this continued all evening through the last race. Petitioner continued to parlay his winnings into new bets up to the last and 13th race of the evening, the twin trifecta, in which he gambled his entire night's winnings, if any. Petitioner had unlimited check writing authority at Phoenix, and in addition to writing checks, petitioner obtained cash using his automated teller machine (ATM) card. Petitioner did not cash checks at the track *542 for any reason other than gambling. Petitioner redeposited his winnings into his checking account, less the cash he started with each evening. Ms. Kay Dicks, a check cashier and mutual teller at Phoenix for 13 years, cashed 95 percent of petitioner's checks. Ms. Dicks has known petitioner for 12 years. Ms. Dicks works at Phoenix 7 days a week. Ms. Dicks testified that all cash that petitioner received from cashing checks was used for gambling. Ms. Dicks further testified that petitioner parlayed his winnings into new bets; the winnings of the first race were parlayed into bets on the second race and so on up to the big race. According to Ms. Dicks, petitioner is the biggest gambler at Phoenix, and based upon her observations of petitioner, he is a net loser at the track. Mr. Richard Klimas has worked at Phoenix for 12 years as a mutual teller. Mr. Klimas works at Phoenix 6 days a week, and petitioner ties up Mr. Klimas' window every evening with his betting alone. Petitioner placed nearly all his bets with Mr. Klimas. Mr. Klimas testified that petitioner is an overall loser at the track. Mr. Klimas also testified that petitioner cashed checks with the check cashier and *543 sometimes used the ATM for cash used to place his bets. Mr. Klimas further testified that petitioner bets on all 13 races every night, never places a bet under $ 300, and is the biggest gambler at Phoenix. Mr. Klimas stated that petitioner continuously rolls his winnings over, taking a winning ticket and betting it on another race. The teller machine automatically subtracts petitioner's wagers from his previous winnings. After the betting is finished, the mutual teller receives a "hard copy" from the teller machine which indicates the winnings on each ticket. Mr. Klimas was asked if any receipts are given to bettors indicating that they have won a race and are now betting that amount on the next race in order that they can keep adequate records. Mr. Klimas stated that the track keeps what is called the "hard copy", which indicates how much the initial tickets were worth, and the track keeps the tickets themselves for their own records; the bettor receives no paperwork whatsoever on this particular transaction. Mr. Klimas works at what is called a "tax teller window". In addition to taking bets and dispensing tickets, Mr. Klimas issues Forms W-2G. These forms report winnings *544 on any ticket which pays $ 600 or more and on which the odds are 300 to 1 or more. The Form W-2G indicates the amount won; it does not indicate the amount wagered. Additionally, if the odds on a particular bet are less than 300 to 1, then a Form W-2G is not issued regardless of the amount of the winnings. For example, if a bet is placed at $ 100 and it pays $ 2,000 at 20 to 1 odds, then no Form W-2G is issued. On any winnings over $ 1,000 from a bet at 300 to 1 odds or more, the track withholds both Federal and State taxes and issues a Form W-2G. Thus, if a bettor places a bet that pays $ 600 at 300 to 1 odds, then he or she will receive a Form W-2G, but taxes will not be withheld from the winnings. On the other hand, if a bettor places a $ 250 winning bet at 30 to 1 odds paying off $ 7,500, the bettor will neither be issued a Form W-2G nor have any tax withheld from his or her winnings. Mr. Walt Collins is a kennel owner of greyhounds and a neighbor of petitioners who has known petitioner for 10 years. Mr. Collins has had business dealings with petitioner. During 1988 through 1990, petitioner borrowed money from Mr. Collins using his greyhounds as collateral. When petitioner *545 was unable to repay his debts, Mr. Collins kept petitioners' dogs. Mr. Collins obtained petitioners' greyhounds at values less than what they were worth because, according to Mr. Collins, petitioner's gambling left him short of money and in need of cash. Mr. Collins testified that he observed petitioner gambling at the track every evening. Mr. Collins further testified that petitioner does not lead a lavish lifestyle, and he has never seen petitioner spend his money on anything other than gambling. Ms. Donna Di Re has worked at Phoenix since 1972 and was married to petitioner from 1976 to 1984. Donna Di Re testified that she and petitioner were divorced because of his gambling, that petitioner gambles nearly everything he has, and that his gambling activities continue unchanged to the present. In connection with their divorce, Donna Di Re and petitioner took out a loan for $ 25,000. Donna Di Re received the proceeds as a property settlement and used the money to obtain a mobile home. Donna Di Re testified that she and petitioner had difficulties paying bills during their marriage. Additionally, petitioner gave Donna Di Re no jewelry or expensive gifts during their marriage; *546 they took only one vacation; they belonged to no clubs; they had only one car, which they purchased used; and they lived in a mobile home. Ms. Natalie Scott is employed at Apache Greyhound Park as a mutual manager and is the mother of petitioner Caroline Di Re. Ms. Scott testified that her parents loaned petitioners $ 50,000 in 1989, which was primarily used for petitioner's gambling activities. Ms. Scott accompanied petitioner to the dog track often and observed petitioner's gambling activities on many occasions, concluding that he is a net loser. Ms. Scott testified that she had once been an employee of a bank, and due to her knowledge of banking, petitioner would ask her questions regarding how long it takes checks to clear and what the "float time" is. Ms. Scott testified that petitioner was heavily engaged in check kiting and visited the bank often. Ms. Scott further testified that petitioner Caroline Di Re received only her car in the settlement agreement with respect to petitioners' divorce. Unreported Taxable Income
Petitioners reported gambling winnings and losses on their tax returns for the years at issue in the following amounts: Item
1986
1987
1988
1989
Gambling winnings
$ 304,896
$ 183,176
$ 266,854
$ 260,910
Gambling losses
281,696
165,850
259,670
250,910
Net winnings
23,200
17,326
7,184
10,000
*547 The race track withheld Federal and State taxes for 1986 through 1989 in the amounts of $ 76,793, $ 43,229, $ 51,440, and $ 41,326, respectively. During the years at issue, petitioner obtained cash at the track for gambling in the following amounts: Item
1986
1987
1988
1989
Checks written
payable to the track
$ 436,550
$ 630,300
$ 407,700
$ 568,500
Cash from ATM
25,697
11,626
14,997
22,613
Total cash obtained
at the track
462,247
641,926
422,697
591,113
Additionally, petitioner cashed in CD's and his IRA, and obtained loans from other individuals to support his gambling activities in the following amounts: Item
1987
1988
1989
5-yr. CD cashed
$   9,854
5-yr. CD cashed
9,985
IRA withdrawal
11,052
Loan from Valley Natl. Bank
50,000
$ 20,000
$ 10,000
Loan from parents
30,000
Loan from petitioner Caroline
Di Re's grandparents
50,000
110,891
20,000
60,000
Petitioner produced daily racing programs indicating his evening's losses, some of his losing tickets, canceled checks written to the track, and statements indicating funds taken from an ATM inside the track as substantiation of his gambling losses and expenses for the years *548 at issue. For taxable years 1986, 1987, 1988, and 1989, respondent contends that petitioners had unreported income from petitioner's gambling activities in the amounts of $ 217,397, $ 458,694, $ 207,160, and $ 314,966, respectively. Respondent contends that petitioners did not maintain adequate books and records of petitioner's gambling activities during the years at issue in a manner acceptable for determination of their tax liability for those years. Respondent employed the bank deposits method to reconstruction petitioners' taxable income and found the excess deposits in each of the years at issue to be unreported taxable income. Respondent's computations are summarized as follows: Item
1986
1987
1988
1989
Total bank
deposits
$ 740,419
$ 956,707
$ 623,977
$ 782,547
Less: Transfers
between accounts
131,296
157,003
2,000
30,732
Less: Sources of
income per
return
444,720
477,369
467,799
466,762
Unreported
income
164,403
322,335
154,178
285,053
Mr. Patrick Schindele, a partner in the investigative accounting firm CRS and Associates, was a special agent with the Internal Revenue Service (IRS) for 20 years and petitioners' expert witness in the *549 instant case. To determine petitioner's spending habits at the track, his personal living habits, and his overall lifestyle, Mr. Schindele instructed petitioner to prepare a check-spread analysis and a bank deposit analysis, and advised petitioner on how to go about doing so. Mr. Schindele examined petitioner's spreadsheets and determined them to be accurate. Mr. Schindele conducted interviews with a number of people including two Phoenix employees, petitioner's ex-wife, Donna Di Re, petitioner Caroline Di Re and her mother, and petitioner's neighbor, Mr. Collins. In addition, Mr. Schindele examined public records to determine petitioners' ownership in property, amounts they had borrowed, and petitioner's divorce files, including settlement documents. Discussion
The primary issue for our consideration is whether petitioners had unreported income from gambling winnings in the amounts determined by respondent for the taxable years at issue. A taxpayer is required to maintain records sufficient to show whether or not he or she is liable for Federal income taxes. Sec. 6001. It is well established that where a taxpayer fails to maintain adequate records, the Commissioner *550 may prove the existence and amount of unreported income by any method that will clearly reflect the taxpayer's income. Sec. 446(b); ; . For the years at issue, respondent used the bank deposits method to reconstruct petitioners' income. The premise underlying this method of income reconstruction is that, absent some explanation, a taxpayer's bank deposits represent taxable income. The total of all deposits is determined by the Commissioner to arrive at the taxpayer's income. An adjustment is then made to eliminate deposits that reflect nonincome items such as gifts, loans, and transfers between bank accounts. Where the Commissioner has employed the bank deposits method in the determination of the deficiencies, the burden of proof rests with the taxpayer to show that such determinations are erroneous. Rule 142(a); . The Commissioner is not required to prove that all deposits constitute taxable income. . *551 The burden of showing duplications is on the taxpayer. . Respondent has allowed petitioners' claimed gambling losses for the years at issue; however, respondent, through the use of the bank deposits method, contends that petitioners failed to report gambling winnings income as reflected in unexplained bank deposits. Respondent further contends that the use of the bank deposits method in the instant case is appropriate because petitioners did not keep adequate records of petitioner's gambling activity as required under section 6001. Petitioner argues that the bank deposits which respondent has determined to be unreported income actually represent redeposits of previously deposited funds into his bank accounts. It is for the Court to decide what effect should be given to a taxpayer's records. This determination depends on the particular facts and circumstances of each case. See . We conclude that the corroborating testimony of several witnesses regarding petitioner's gambling activities together with the documentary evidence, *552 i.e., petitioner's canceled checks written to the track, his ATM activity at the track, and his various loans, provide a sufficient basis for decision in the instant case. See, e.g., . For the reasons set forth below, we find that petitioners have met their burden of proving that they did not have unreported income from gambling winnings in the taxable years at issue. Petitioner testified that in the course of his regular gambling activities, he would withdraw funds from his bank accounts in the form of cash or checks, gamble with those funds in the evening, and then redeposit the funds which he had at the end of his gambling day. In using the bank deposits method in the instant case, respondent did not back out petitioner's wagering expenses; i.e., the checks he wrote to the track and his cash advances from the track ATM. The parties have stipulated that petitioner was a heavy gambler who frequented the race track as often as 7 days a week. It is clear from the record that losses were in fact sustained. Ms. Dicks, Mr. Klimas, and Ms. Scott all testified that they had extensive firsthand knowledge of petitioner's *553 gambling activities, and all three testified that petitioner was a net loser with respect to gambling. See, e.g., ; . Petitioners' expert witness, Mr. Schindele, is an investigative accountant and former IRS special agent. We do not question the qualifications of this witness. Mr. Schindele's expert witness report consists of a source and application of funds schedule, a net worth schedule, and a bank account analysis. In his bank account analysis, Mr. Schindele made an extensive review of petitioners' bank statements and concluded that the majority of the deposits into petitioners' checking account represented cash and/or checks from the Phoenix dog track. Furthermore, Mr. Schindele concluded that greater than 99 percent of the deposits and expenditures were identified and accounted for, and nearly 80 percent of the expenditures from petitioners' checking and savings accounts represented checks written to dog tracks. These expenditures were not taken into consideration in respondent's bank deposits analysis. In order to determine *554 if petitioner expended more funds than his sources of income per return, a source and application of funds schedule was prepared by Mr. Schindele. Mr. Schindele examined petitioner's returns, his loans from family members, bank account data, and information provided by petitioner verified by third-party interviews and examination of independent records. In this analysis, Mr. Schindele determined the amount of funds available to petitioners from all sources, the amount of petitioners' expenditures, and the amount of excess funds available during the years at issue, and concluded that the excess in each year was used for petitioner's gambling activities. Mr. Schindele also prepared a net worth schedule for the years at issue. From an extensive examination of petitioners' bank account ledger sheets, bank account data, real estate purchases and sales, investment information, depreciation schedules, and the cost of petitioners' personal assets, including purchased vehicles, Mr. Schindele determined petitioners' assets during the years at issue. Mr. Schindele determined petitioners' liabilities for the years at issue by conducting interviews with those individuals who had made loans *555 to petitioners as well as examining petitioners' bank loan data. Mr. Schindele concluded that petitioners had neither acquired substantial assets during the years at issue nor had an overall increase in net worth during those years. We find Mr. Schindele's testimony and findings in his expert report to be consistent with the testimony of the other witnesses in this case. The overwhelming evidence in the instant case indicates that petitioners did not have the income attributed to them by respondent. Additionally, we found petitioner's testimony to be credible and sufficient to establish the fact that for the years at issue petitioner was not the winner at the racetrack that respondent's determinations depict him to have been. Petitioner clearly lost more at the racetrack during the years at issue than he won, and his living style supports this fact. During the years at issue in the instant case, petitioner did not have cash reserves; in fact, the contrary seems to have been the case. Petitioner's depiction of his financial status is supported by evidence that he purchased no assets, lost his racing dogs, did not lead a lavish lifestyle, borrowed substantial sums of money, and *556 cashed in his CD's and IRA's. Although respondent's determinations are generally entitled to a presumption of correctness, we find that petitioners have met their burden of proof in the instant case. Based upon all the facts and circumstances, we find that petitioners' unexplained bank deposits for the years at issue represented redeposits of previously deposited funds into petitioners' bank accounts. Accordingly, we find that petitioners do not have additional taxable income for the years at issue in the instant case. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the years in issue.↩